May it please the Court, my name is Sandy Svetkov of the Robbins Geller Firm here in San Francisco. With me at Council Table is Patrick Coughlin, the Chief Trial Counsel in this case. I represent the Pension Fund and the other class members. I'd like to reserve five of my 20 minutes for rebuttal. Appellants ask for reversal of the summary judgment in this case. Judge Zolston is a terrific judge, but she made legal errors in this case that require the reversal of summary judgment. Apart from the fact that the plaintiff submitted substantial evidence supporting triable issues of fact, including what the first court in this case, in this circuit, said was a truly astronomical $900 million in insider trading. The tipping point is that the same person who engaged in the insider trading engaged in willful destruction, willful spoliation of 1,600 emails and 150 tapes. And this Court's jurisprudence will overturn summary judgment in that circumstance. This is willful destruction of evidence. Well, the sanction that the district court fashioned for the spoliation was that you were entitled to an adverse inference if you established the materiality of the facts. And as I understand the district court's reasoning, she didn't think that you had established the key facts that could then be adversely inferred to Mr. Ellison and the other traders. Actually, Judge Tallman, what she said was, because we didn't present a triable issue, since we didn't meet the summary judgment standards, she wasn't going to draw adverse inferences. Aren't we saying the same thing? No. Maybe not. Because in the Cronish case, which was followed in medical laboratory, the Court said you don't have to show triable issues, you just have to come close. And that's the difference, because to do otherwise, Judge Tallman, is to reward the spoliation. Let me give you a specific, so we're not arguing hypothetical law here. What you needed to produce, it seems to me, in order to take advantage of the spoliation sanction would be emails that were sent to Mr. Ellison before he completed his trades, showing that he knew that Oracle was going to miss its mark. And you had 2.1 million documents produced. You took, what, 100 depositions or more? Do you have any evidence of an email that was sent to Mr. Ellison before or during the relevant time period, which we could then draw the adverse inference from, that he actually received and knew about the content of the email? The January 17th flash report of falling sales in the North American Sales Division and the OSI Sales Division, 42% of the company's business were going south on January 17th. And Mr. Ellison ordered trading to begin within 36 hours on the 19th of January. And he proceeded to sell the $900 million, triggered by that. And the evidence in the record shows he had not sold for five years before that. And the evidence shows he did not intend to sell until either April or August later in the year. And suddenly, having received that flash report, and 36 hours later, $900 million of trading begins. That is a significant coincidence in time. But that's not all we have. On December 7th, Mr. Winton, in the North American Sales Division, the finance director, told Henley and Ellison and everybody else in the top management, our pipeline in North American sales is 50 million below applications, 70 million below technology sales. We have no big deals in the pipeline. Two days later, Mr. Giacoletti, the executive vice president for Europe, said, I cannot sell the Suite 11i product. It's not translated. It's not working. That's way before the class period, they're told that. Now, what is significant about Suite 11i? This company started the quarter knowing that the economy was going south for its competition, Microsoft, Intel, Cisco. What did they tell the public for two and a half months? We have this wonderful new product, Suite 11i applications. It's plug and play. It's integrated. It will save you money. It will sell. It will ride us through this economy. And we will not only ride through it, we will make two cents more this quarter. We will sell an astounding 75% applications. None of that happened. They missed by two cents. They only sold 25%. They missed big time, and they knew it at the front end. And what did Giacoletti say a week after they missed to Mr. Henley in an e-mail? You know, there's an internal only simple explanation for this. 11i didn't work. Now, what do you do with all of the projections in February and in January that show that they were on target for the most part to make 12 cents a share? Actually, if you read the defendant's own documents, when the divisions are saying we're going to meet our forecast, the division forecast in the chart, that only gets them to 10 cents. It's the upside that Ms. Minton added. Yeah, I'm talking about Minton's upside. Yes, they were not meeting the upside. If you read Mr. Winton's January e-mail, the January 11th e-mail referred to on page 44 of Judge Ilston's order, it says we're sticking by our forecast, the 346 million. That's the division forecast that gets them to 10%. And then she says they're revising the upside. But she leaves out the following words. We're revising the upside down by 16.8 million. So the upside, the stuff that was going to get them to 12 cents, Judge Tolman, they weren't making. They were only making what the division told them they would make, which is the basic forecast which would get them to 10 cents. And that's what they wound up making. So are you conceding that Oracle did use more than the conversion factor in producing the upside reports? I'm not conceding that at all. That's their theory of the case. That's not ours. How do you explain the fact that if you just apply the conversion rate straight across, it's higher than the upside reports? There are no upside reports. The upside reports have three numbers in them, the forecast that the division gave, the upside number, which is what Minton slapped onto that as what they hoped to achieve, which was a forecast that was made up. The real forecast is what the division told them, and that's all they made for the quarter. I'm referring specifically to SER 1355, which is the color-coded chart that was produced, I think, as an appendix or referenced in the briefs, the comparison of potential conversion ratio for the third quarter of 01 and the actual conversion ratios. I mean, doesn't that show that if they strictly applied the conversion ratio, the numbers would be higher? Judge Tolman, that's a wonderful argument for them to make to a jury. There is evidence on the other side that that wasn't going to happen and they knew it. This is not a trial, Judge Tolman. This is summary judgment. They have evidence. I keep asking you, what's your best evidence that you're going to introduce at the trial to show that they knew? And I'm looking at a record that's replete with evidence that they didn't know at the time that the trades were made. I'll go back again to the beginning. They said to the public, we have this wonderful new product, suite 11i. It's going to ride us through this situation, this economy that's sliding for all our competitors. It's going to make us $0.12 earnings and 75% applications growth. They knew from the e-mails they were receiving internally from Giacoletti, from Winton, and from others, that 11i didn't work. And it was not selling like hot cakes, as they professed. And they were getting reports all during the class period that that was so. The first flash report, the second flash report, internal e-mails were all occurring. That's conflicting evidence that says their predictions based on this conversion ratio and upside report wasn't happening. Those e-mails count. They don't get thrown out. This is not a pleading case. This is something that we can argue at trial to a jury. And, you know, you want to have a hypothetical about the spoliation. Supposing one of the e-mails that's missing, Judge Tallman, said something like this, Mr. Ellison speaking. Oh, my God, Henley, we're not going to make the quarter. 11i isn't working. Let's tell them it's the economy. Now, the case would settle. And I didn't make that up. Because in the Houston e-mail in March, when the public relations director of Oracle was reading the analysts who were saying it's not just the economy, it's the product. She was telling her people, let's get back on message. We've got to tell them it's the economy. That's conflicting evidence to defeat this theory that it was the economy and not 11i. And more importantly. Of course, that was after the March 1 press release from Oracle, wasn't it? Yes, it was three weeks later. And aren't you entitled to draw inferences backwards and forwards in the law? I was here yesterday scouting this panel, and I heard Judge Fernandez engage the public defender. And the public defender accused Judge Fernandez of engaging in speculation.  I was drawing an inference. Well, we're entitled to the inferences at summary judgment. And that's not what happened here. But I don't understand that inference. I thought the problem was somewhere in the briefing, anyway, that they were saying the economy's not affecting us. That's what they were telling the public. It's not affecting us. We're going to do it another way. Exactly. After the stock fell, it seemed to me. Isn't that true? Is this lawsuit talking about three weeks after the quarterly report, or is it talking about a shorter time frame? We're talking about a March 1 disclosure followed two weeks later by a second disclosure, the March 1. And then they were saying, well, it's the economy. So it would seem that folks weren't buying their stock based on the fact that they said it was the economy. They didn't say it was the economy, did they? Well, I think you have – here's the message that was going on during the third quarter, Judge Fernandez. Yes, the economy is declining. And, yes, it is affecting our competitors. And it might affect us, but we have this wonderful new product. And this product, 11i, which had problems prior to the class period, version 3 is working. And 11i is going to get us through the economy, so buy Oracle stock. At the end, they say it was the economy. And we said it was as much 11i as the economy. In fact, if you talk about context – you know, I used to come here as a defense lawyer in Lucia Belovit when the courts say to plaintiff's lawyers, you're out of context, you're taking this out of context. The context here is they said the economy is saved by 11i. So when they said on March 1, it's the economy, it has to be 11i. The inference is it's 11i. And that's where the spoliation comes in again, just as I said in my hypothetical. If they sat around a table and said, we can't tell them it's 11i, let's tell them it's the economy, that doesn't save them. We win without spoliation. We're over the top with spoliation. That's what's really at work here, Your Honor. This case has facts on both sides. Let me ask you, which report specifically questioned the truth of these statements regarding 11i? You mentioned one report. Giacoletti's report. Giacoletti was at ER 1571. Shortly after the class period, he tells Henley in an email, there's an internal only explanation for our missing the quarter, ER 1571. But on December 9, he told Ellison and Henley in an email, I can't get 11i to work. And that's at ER 1542 and 1543. I can't get 15. And if you look at the briefing, there's lots of evidence that they saw the problems, not only among their customers with emails with customers saying, this is not working, but also within Oracle itself. They were having problems with the product itself. And in Ellison's own book, which the judge excluded, even though he adopted it and it was his own statement, Ellison says in Software, you didn't have to be a genius to know it wasn't just the economy. It was problems with the stability of the product. Now, that's evidence, Your Honor. And it was excluded as hearsay. How can it be hearsay? It's the defendant's own adopted statement. He said he reviewed the book and edited it. It's not hearsay. Houston's email is not hearsay. It's a statement by the company, Rubin's email, that analysts were right. It was 11i. And for the judge to say that the Bank of America and the other analysts didn't get it right, the Bank of America said it was 30% the economy, 70% 11i. That's conflicting evidence. There's conflicting evidence up and down this record, Judge Tolman. This is not America West. This is a case where the stock dropped 20% when the disclosures were made. And quite close, the loss causation standards are amazing here. The court asked for undisclosed facts. No undisclosed facts were revealed on March 1st. Sure undisclosed facts were revealed on March 21st. They said during the class period 11i had been stabilized and was selling like hotcakes. Not true. It was not. It was just as bad as it was prior to the class period. But that's new information because there was intervening misstatements that neutralized the prior information. Judge Yelston didn't put that together. That's wrong at summary judgment. We get the inferences. You can't switch in favor of the defendants at summary judgment. You must draw the inferences in our favor. And we have inference and email and email, and then we have willful spoliation on top of it all. If a case like this with $900 million in insider trading and willful spoliation cannot get to a jury in a securities case, what case can? Thank you, Your Honor. I'll save my time. I will give you four minutes, Your Honor. Ms. Sullivan. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan for the appellees. Judge Tolman, you're exactly right. We're here after nearly 10 years, 2.1 million pages of documents produced from 129 custodians at Oracle, 134 deposition days, 100 subpoenas to Oracle customers, and Judge Yelston's meticulous 50-page summary judgment ruling, which went through all the evidence, correctly decided that summary judgment should be granted to the appellees. Now, let me begin where Mr. Svetkoff left off. He said that all inferences should go to him, but, of course, that's not the standard on summary judgment. The standard on summary judgment, which Judge Yelston correctly applied, is Anderson v. Liberty Lobby. The plaintiffs can't just cherry-pick a Giacoletto email here or an email from Wynton there and say, aha, we've beat summary judgment. No. The standard in Anderson v. Liberty Lobby is that the plaintiffs have to show not just some evidence, not just some colorable evidence, but significant evidence that tends to allow a reasonable jury to decide by a preponderance in favor of the plaintiffs. And they haven't come close to that standard here. Let me begin, Judge Tallman, where you did with the forecasting claim. Remember, there are four basic claims here. And the central claim, and, Judge Fernandez, I would like to go back to your question, the only thing at issue is the March 1st statement. Mr. Svetkoff can't come in now and say there are two statements that supposedly disclosed fraudulence to the market. They said at class certification that this is a one-statement case and it's all about March 1st. They can't. That's how they got class certification. So this is a one-statement case. And the question is, with forecasting, did the forecast that Oracle set forth on December 14th, 2000, reiterated throughout the third quarter of 2001, in any way portray falsely the prospects for the company? The company said we'll make 12 cents, we'll make 25 percent license growth. And that was absolutely based on true fact at the time. Why? Let's go back to the Minton Upside Report. Four sources of information about the correctness of that prediction, Your Honor. Let's start with the Minton Upside Report. Minton Upside Report, which is a bottom-up forecasting tool, had correctly predicted the earnings for the company for seven quarters straight. For seven quarters straight, the Minton forecasting model had predicted earnings that Oracle either met or exceeded. And it did so into the beginning of the downturn of the economy. Oracle met or exceeded its guidance in the last few quarters of the calendar year 2000. Sorry, the last two years of the fiscal year 2000. And that shows that Minton's bottom-up forecasting method was working. But don't just rely on that. And you're absolutely right, Your Honor. When the conversion ratio was applied, it was applied conservatively. Remember, Minton says, based on her upside report in December, that you could predict 13 cents a share. But the company shaved a penny off and predicted 12 cents a share. It predicted 25 percent growth. Had she applied the conversion rate of 53 percent from third quarter in 2000, it would have predicted 53 percent. No, we implied an announced conversion rate of 42 percent. So if we start with the first of the four reporting devices that make the forecast absolutely truthful, at December 14th, the upside report, easy case, nothing to falsify it. The pipeline reports throughout the period predicted growth of 28 percent to 34 percent, exceeding at all times the prediction of 25 percent growth. So the pipeline report, which is telling you potential deals. Let me ask you about the pipeline concept because it throws me a little bit. The upside report, I thought, and the magic of the upside report is taking everything into account, presumably the economy, everything else, because when people are reporting what they can sell, that, I suppose, reflects the economy to some extent. So if the upside report is ultimately the test, what happens during the third quarter when the upside report, it drops, I think, on the first one. It comes up on the second one to 12 cents. And then I think on the third and fourth, it's back down to 11 cents. Now, what is the pipeline? So when it dropped in the first week, I guess, to 11 cents, what does the pipeline tell me about what I should say about the fact that the upside says, we project that we're only going to make 11 cents. And then people start talking about the pipeline. What do I care about the pipeline if the upside tells me that? Well, Judge Fernandez, let me take the pipeline and add one more concept to the next, and that's the hockey stick effect. The hockey stick effect helps us see that what's in the pipeline principally gets converted in the last week of the quarter. In fiscal 2001, Oracle made 54 percent of its total revenue from sales closed in the last week of each quarter. But why doesn't the upside take account of the hockey stick? Well, it does indeed, Your Honor. The upside is taking into account reports from the field. And let's go back. I want to remind you of what the upside report is saying, especially during Mr. Ellison's trading period. The reference Mr. Svetkov made to improper insider trading is entirely wrong. What Mr. Ellison knew as of January 19th to January 31st, when he's engaging in these trades, for independent reasons, because his broker said get rid of some debt, because he was cleared by his GC and by his CFO, because he had checked the flash report on January 17th, and I'll get to that in a minute, and seen that we were looking at 35 percent growth. We were on track. But to go back to the upside report, crucially, Judge Fernandez, from all of January 19th to January 31st, the upside report is at 12. The upside report is at 12 the entire quarter, except for the dip to 11 on February 5th and the dip back to 11 on February 19th. But the hockey stick effect works this way, Your Honor. The pipeline tells you these are the people we think might commit, but most of them tend to commit in the last week of the quarter. The overwhelming evidence in this case is that what happened is that deals that normally would have closed in the last week of the quarter didn't close, because at the highest level, the CEO and the CFO, not the field divisions, not the CIOs, they said the economy is scaring us, we're going to defer deals. So the hockey stick effect that normally enabled pipeline to convert and the upside to be met didn't materialize this quarter. That's not really my question. My question is why isn't the upside report, if it's an accurate predictor of what we can say the shares are going to earn at the end of the quarter, let's say, if it's an accurate predictor, why isn't it taking account of the fact that there may be a hockey stick effect? If the upside is an accurate predictor. I'm talking about the pipeline. I understand the pipeline. The upside report tells you, based on bottom-up information about sales, what's in. So does the flash report. Flash reports are the actual dollars in the door. Your Honor, if I could ask you to turn in the red brief to page 25, I think I have the answer to your question. In the Oracle brief on page 25, you'll see a chart, and it shows the power of the upside report to predict earnings per share to be down in the last week of the quarter in its prediction, below what has been predicted for guidance, and to make the forecast amount anyway. If you look at that chart, it shows that the upside report was back by a greater margin than we are on February 26th. On February 26th, we're at 11.2. Sometimes the upside report is telling you we're a penny behind. We're more than a penny behind. And because of the hockey stick effect, in all seven prior quarters, the company was able to meet or exceed its forecast. So the upside report is telling you what we know from on the ground, but it's enabling you to close that gap in the last week. The story of this quarter is, the overwhelming evidence showed, that the deals didn't close in the last quarter. They slipped because of concerns about the economy. Now, if I could, let me just mention two other things. Mr. Svetkov cited to you the January 17th flash report. And he said, oh, it's very suspicious. Mr. Ellison has now seen the company is tanking, and he's suddenly trading. But if I could ask you to turn to supplemental excerpts of Record 470, you'll see what the January 17th report said. At SER 470, what the January 17th flash report actually said, contrary to what Mr. Svetkov represented, is that the license revenue growth rate is 35 percent. Thirty-five percent. We're on track to make 35 percent. That's ten points above the guidance of 25 percent given in December. And further, the January 17th flash report says that our December license results, that's money in the door, hit 19 percent. Where were we last year at this time? We were at 16 percent a year ago. We were at 19 percent two years ago. So the upside report is on track to close the quarter on target. In seven prior quarters, the deficit had been closed in the way it could have been closed here had the hockey stick kicked in. The flash report says we're on target. Mr. Ellison's trades from January 19th to January 31st, with the approval of his GC and his CFO, are taking into account that everything looks on target to close. Now, there's other evidence that overwhelmingly refutes that there was any knowledge prior to the very end of the quarter, the 26th, 27th, 28th, that this time, for the first time in eight quarters, the hockey stick wasn't going to work. Now, by the way, you had field divisions. The field divisions, the guys out on the ground who are selling product to customers, did not significantly change their forecast until February 27th and 28th. Did not significantly change their forecast, of course, January 19th to 31st when Mr. Ellison is trading. So you've got four reports, upside, pipeline, flash, and field. And, by the way, the flash report for February 7th is – February 8th is equally predictive of making the quarter. We're at – now we're at 33 percent of sales – 36 percent of sales. Previously, we were at 33, 38. All four reporting sources are telling Mr. Ellison and the company we're going to make the quarter. Now let's look at the overwhelming evidence Judge Ilston credited for why this was an unusual quarter that slipped at the end. We've got many sources of evidence that say we were surprised. We were surprised at the end. The field analysts changed their forecast only on February 27th, 28th. The classic email, the email from one of the area vice presidents, says, I've let you down. 70 deals slipped. We're so surprised. And Mr. Svetkov in his briefing says, oh, well, it was never authenticated. But if you look at where the classic email appears in the record, excerpts of record 2471 to 72, you'll see that Nick Classic, who unfortunately later became – had a stroke and was unable to tell us himself, but he's in an email chain with George Roberts, his superior officer, reporting back to Larry Ellison himself and saying, we were very surprised. We've let you down. The end of the quarter was different this time. There's plenty of other evidence showing there was a surprise motivated solely by nervousness at the top levels of senior management about need to defer deals for capital preservation because the economy was turning. That's the forecasting claim. Now, when – so the Ellison trades were not insider trading based on – and the statements by counsel as to the records showing that it was in deep trouble, was not selling, and that was known and that was the rationale for the exercise, the options in selling the stock, basically. Is it true that there are reports that question the truth of the statements regarding 11i, that it actually was not selling well, it was not doing well, and that there were rejects by the clients? That's – Judge Hogan, let me – that's not true. The claim on suite 11i – by the way, why are we talking about product defects in this application software? Because their forecasting claim has collapsed. Their forecasting claim is unsustainable. So they now say, oh, you had a buggy product. You said it was going to be complete and integrated and interoperable out of the box, and then it had these alleged defects. Now, there's no evidence in the record to support this argument. And let me just remind you, Your Honor, why Judge Elston threw this part of the case out. She throws out the forecasting claim, gives summary judgment to Oracle, because she said there was no falsity. Every piece of inside information supported the belief, number one, that we would make the quarter, and number two, that the economy was not at that point in January or February having an effect. But she throws out the suite 11i, Judge Hogan, for a different reason, and that's for loss causation. She says there's no loss causation. The law in this circuit is so clear after Metzler v. Corinthian that following the teachings of the Supreme Court in Dura, loss causation can be shown only when there is a causal link between the allegedly fraudulent statement or nondisclosed fact and the earnings miss. Now, Judge Hogan, nobody's disputing that we missed our earnings because we had disappointing sales of suite 11i. That's not the issue. The issue is why. Why did we have disappointing sales of suite 11i? And Mr. Svetkoff is claiming that the reason is that it didn't work. It's like a car without wheels, and that's why it didn't sell. They don't have a shred of evidence to support that. Judge Hogan, let me give you the best, best piece of the record that I can give you to make that point. They subpoenaed 100 customers, 100 Oracle customers, and they came before this circuit back in 2003, 2004, after Judge Jenkins initially dismissed the complaint, and they said, we are going to show you that $186 million of suite 11i deals were canceled from four different customers because of the bugginess and defects in the product. Well, they've had six years and 100 subpoenas, and they haven't shown one single deal, Your Honor, not one single deal that closed because suite 11i was defective, not one single deal that was scheduled to close in the third quarter of 2001 and that failed to close because of defects. Now, the best that Mr. Svetkoff can come up with is an after-the-fact email by Sergio Giacolato, who's the head of North America, Middle East, and Africa, knows nothing about North American sales, has no jurisdiction over North American sales, and no basis for being an admission about North American sales, which is what I was supposed to slip, and a couple of analyst reports, and if I could refer, Your Honor, to the analyst reports, the overwhelming, overwhelming evidence in the analyst reports is as follows. Suite 11i, if it has any problems, it's not that it doesn't work. It's that the suite 11i, which is a new integrated product, it's plug and play. It does everything at once. You don't have to hire a programmer to take best of breed from company A and stitch it together with best of breed from company B. Not every customer has that preference. The analyst reports, if they're talking about customer issues with suite 11i, are not talking about defects, and again, they failed to show a single, single deal that failed to close as scheduled in third quarter of 2001 for defects. They're talking about the time it's taking for customers to get used to buying one-stop shopping as opposed to multiple parts. Now, Your Honor, we're not afraid of the few pieces that Mr. Speckoff might cherry pick, and I'll just anticipate his possible rebuttal. He'll say, oh, the Bank of America report, the UBS Warburg report, these reports that talked about how suite 11i is not ready for prime time or it's not doing as well as it should. You're welcome to read them, Your Honor. The Bank of America report at ER 852, if you look past the quote there at excerpts of record 855, you're going to see that Bank of America is saying suite 11i seems to be selling very well, and we actually think its integrated feature is going to make it do even better in the downturn because it's going to give ER 855 a promise of quick return on investment, and we'll know in two weeks whether this is good news or not for Oracle. So, Judge Hogan, at the end of the day, there's not one iota of evidence, much less enough to make a reasonable jury find by a preponderance, to say that suite 11i was buggy, we didn't tell the world, and that's why we collapsed. And Metzler requires that there be a link between suite 11i's supposed defects that we didn't disclose and the loss. And if they can't show a single deal that slipped because of supposed defects in the third quarter, they can't show loss causation under Metzler. Just like Metzler said, there's no connection between the supposed manipulation of student admission records and the earnings disappointment Carinthia College has had, so here there is nothing. Nothing was pled adequately for loss causation in Metzler. Nothing was proved adequately for suite 11i loss causation. Now, Mr. Stetka says, oh, but what about the Simons report and Mr. Ellison in the book? Well, first of all, I need to just point out, Your Honor, that when Judge Ellison excluded as inadmissible hearsay the passages from Software, the Houston and Rubin e-mails, she also excluded 20 pieces of evidence as inadmissible hearsay that supposedly went to economy statements, the economy isn't hurting us, reiteration of guidance in suite 11i. Why did she exclude all those? We moved to exclude them as hearsay. We started doing so back in February 2007 before Judge Jenkins at S.E.R. 2539 and 2546-48. They had 19 months, 19 months to answer these hearsay objections, and they never put in a single opposition to the exclusion of this evidence as hearsay. We objected again before Judge Ilston at E.R. 803 and 809-14. In 19 months, they never said this hearsay objection is incorrect. Despite filing lots of other objections to our evidentiary rulings, and nothing prevented them from briefing it in the time Judge Ilston was taking to write the opinion. So Simons and Houston and Rubin and the 20 other pieces are properly excluded as hearsay. They forfeited their right to bring it back in. But even if you brought it back in, Simons, a journalist's double hearsay speculation about suite 11i is not an admission of Larry Ellison, and it's long after the fact, and it can't tell you the key thing. Again, for loss causation, the key, key thing to look at is how did the market react? Did the market recognize that suite 11i problems were the cause of the earnings miss? And the plaintiffs have failed to show any evidence that suite 11i was linked as the cause, as the cause of the earnings miss. And Messler couldn't be clearer that a mere earnings miss alone is not enough to show loss causation. Now, Your Honor, I do want to talk for just a moment about the spoliation, because Mr. Svetkoff said some very incendiary things about that. I'm going to give you both a little extra time, so go ahead. Thank you, Your Honor. Let's begin with what was actually determined. Judge Ilston did not say there was a deliberate destruction of evidence. Just say you should have preserved some e-mails. You didn't. I'm going to give an adverse inference. You should have preserved some tapes. You didn't. I'm going to give an adverse inference. There was no finding of intentional destruction of evidence here, and I must strenuously disagree with Mr. Svetkoff on that. But what did she say? She said the adverse inference will be drawn with respect to Mr. Ellison's knowledge. If you look at excerpts of record at page 58 and 61, she says, if the plaintiffs can show falsity, if the plaintiffs can show loss causation, that is, suite 11i problems led to the miss, then I will use the inference to infer that Mr. Ellison might have known contemporaneously of those things. But as I've already pointed out to you, there was no falsity to know about, because when Larry Ellison looked at the flash report on January 17th, it said we're at 35 percent growth and we're on target to meet 12 cents. So there was no falsity, and there was no reason to think suite 11i, which, by the way, sold a billion dollars' worth of product in the fiscal year 2001. Judge Hogan, it came back in the fourth quarter and it sold $348 million worth of product. This is a product that has been extremely successful, as predicted. But just to go back to the spoliation, there was no reason to apply an inference of knowledge when there was no basis for the other elements to have been put into triable issues in this case. No recklessness on the part of Mr. Henley when he talked about the economy doesn't seem to be having an effect yet. No falsity with respect to the reiteration of the guidance, and no loss causation with respect to suite 11i. We haven't even touched on second quarter earnings, but obviously there's no loss causation there. The HP swap deal isn't in the case. It wasn't pleaded. It wasn't in the paragraph at page 11 they say it's in. Judge Infante said it wasn't in the case, and he was the discovery master. So HP is not in the case. And as to the supposed bad debt transfer, second quarter can't have caused any market recognition of the reasons for the third quarter miss. Why? Because second quarter's never restated. Analysts always restate the earnings as they came out. They don't, analysts don't say we missed anything in the second quarter. So as to, if there's no recklessness, there's no falsity, and there's no loss causation, you don't get to Scyander, and you don't get to any adverse inference. And just the last point on the spoliation, Judge Tallman, is that the Larry Ellison emails were often, the plaintiffs had access to a record in which all the people who corresponded with Larry Ellison had turned over copious amounts of documents, 2.1 million pages of exhibits from 129 custodians, many of whom corresponded with Mr. Ellison. If there was something to find in that evidence, apart from the inference of knowledge, it would have been found. It wasn't. And, Your Honor, who is the best judge of the scope of her own sanction? The district judge. The district judge who heard the evidence is subject to abuse of discretion, so there's no traction at all in the decision about the adverse inference. It was properly applied. So putting this all together, Your Honor, this is an easy case under Anderson v. Liberty Lobby. There is no triable issue that has come up in any of the pieces of evidence that Mr. Svetkoff has tried to cherry-pick before you that comes close to a reasonable jury being able to find falsity, recklessness, or loss causation from Suite 11-I or the second quarter. And we respectfully submit that you should affirm. Thank you very much. Thank you very much. Let's give Mr. Svetkoff an extra three minutes. I'll start backwards because Ms. Sullivan suggested that Judge Ilston did not find that the destruction of evidence was deliberate. At excerpts of Record 58, Judge Ilston said, Second, defendants destroyed or failed to preserve Ellison's e-mails willfully because they had some notice that the documents were potentially relevant to the litigation before they were destroyed. That's willful, deliberate destruction. What Ms. Sullivan said is dead wrong. And even if we accept that, Mr. Svetkoff, and obviously the district court fashioned a sanction so it found there was foliation, what is your response to Ms. Sullivan's argument that out of 2.1 million documents, you still don't have a single e-mail to Mr. Ellison from which an adverse inference might be drawn that he received and read it? Your Honor, we do have those. I discussed them in the opening argument. I've outlined them in the briefs. We're talking flash reports. I'm asking you specifically do you have a communication that was sent to Mr. Ellison at any time during the relevant period that contains damaging admission on the part of Oracle that he must have known about through the inference before he engaged in his trade? What about the flash report, Your Honor? Let's look at the flash report. Ms. Sullivan says it doesn't say anything about bad news, but it does. The flash report says that NAS was down 85 percent in sales and OSI 24 percent in sales and the smallest division, OPI, was making it only because of one aberrant sale. Just to make sure we're on the same page here, I'm looking at the January 15 pipeline report. That's correct. SER 679, is that what we're talking about? I think I pulled that out here. I have it here. It's at ER 2242 and 2243. And at ER 2243, under OSI, it says negative 81 percent, and under NAS, negative 24 percent. I'm still not sure where I'm— I'm happy to hand it up to you. All right. Why don't we do that? ER 2243. Okay. Now, those two divisions are 42 percent of the company. And if they're going south and two days later he starts trading, that's significant. Well, let me just— You want to— Let me ask you a foundational question. Well, see, the first page says— Yeah. You anticipated my foundational question. Your Honor, all of this is in the record, and that's the whole point of this. Well, I understand, but I haven't read 2.1 million documents. I know you haven't. I know you haven't, but this is de novo review. And the point that we've been making to your Honor is Ms. Sullivan made a great factual argument. And she said something very telling. Look at the evidence Judge Ilston credited. Judge Ilston has no business crediting evidence at summary judgment in favor of the defendants. She has only the ability to decide whether they're genuine issues of fact. She did not do the Rule 56 job correctly. And this business about the upside reports and forecasting is defendants' theory of the case based on that evidence. Our theory of the case is 11i didn't work, and the headquarters knew it. Giacoletti is part of the headquarters. De Cesar told us afterward in deposition all of the statements about 11i were false. If you want a cite to De Cesar, I'll provide it to you. ER 1635 in deposition, when asked whether or not that systems integration was true or not, false, false. Now, this, our theory of the case is 11i was what prevented them from making their numbers. They want to slice and dice this case into a forecasting case separate from a different, it's not, the forecasting is not separate from 11i. And it is not true that they made all their quarters prior to the third quarter. Remember, based on Accountant Regan's testimony, Judge Ilston acknowledged that there was at least a triable issue of fact. That's the falsity of the second quarter. If you remember the evidence, Mr. Henley said the second quarter number of 11 cents a share leads me to conclude that we'll, based on our conversion ratio, we're going to make 12 cents in the third. They didn't make 11 cents, they only made 10 cents in the second quarter. That's part of our submission. The whole predicate of this case is they want you to look at upside reports and forecasting, slice and dice this case up. This is a fraudulent scheme. The forecasting, the second quarter book cooking, the 11i concealment, and the false statements about the economy are an integrated theory of the case that we will argue to the jury. She made a great jury argument, but this is not the place to do it. I'm sort of making a jury argument now myself, and I apologize for it. But I have more license to do it than Ms. Sullivan does because I am entitled to the inferences at this stage. It's my burden, I have lots of evidence, and I have willful spoliation. So if I came close on any of these issues, the spoliation gets me over the top. But on 11i, I'm already at a triable issue of fact. 11i didn't work. They knew it. They kept telling the court. What's your response to her statements about the hearsay objections were never answered and therefore the judge accepted them? Take a look at ER 810 of the record, Judge Hogan. There's not the word attribution doesn't appear. They never made an attribution. But even if they did, there's plenty of evidence in the record that the people who asked did they make the statements in the analyst report said they did. And Mr. Chen for Deutsche Bank filed an affidavit in this case saying I took the statements attributed to Henley in my analyst reports. I took those statements. That's what he said. And remember. That's not the question. The question is an objection is made. You have 19 months to respond and there's no response to the objection. What is the district court to do in that case? Judge Tolman, the objections were made two days before the hearing. The protocol in the Northern District of California, which is under review and there's a pending rule to change it, to have the objections and responses in the summary judgment motion papers, the objections were filed on both sides two days before the hearing. No one raised, Judge Ilson never questioned at the hearing any issue about hearsay. Where there were specific motions in limine, those were briefed, including the business about that classic e-mail. If you look at that e-mail, it's, there's no authentication on that e-mail. And that's not the problem. I hear your response now and it's a good response. But the question is why didn't the plaintiffs respond? And why is it improper for a district court to sustain an objection to which there is no response? Your Honor, we did object to the classic e-mail. We fully briefed that. And she said, and she didn't rule on it. She just accepted the facts and never ruled on our objection on authentication. That's the point. We got it. Okay.  Thank you. The case was very well argued. It's a pleasure to hear from good lawyers on both sides. And the case is taken under submission. We'll get you an answer as soon as we can. We are adjourned for the day.
judges: Hogan, Fernandez, Tallman